IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Case No. 06-00074-01-CR-W-DW |
| MICHAEL L. DALE, | ) ) ) | |
| Defendant. | ) | |

REPORT AND RECOMMENDATION

This matter is currently before the Court on Defendant Dale's Motion to Suppress Statements. For the reasons set forth below, it is recommended that this motion be denied.

I. INTRODUCTION

On February 28, 2006, the Grand Jury returned a four count indictment against defendants Michael L. Dale, Dyshawn L. Johnson and Bryant M. Burton. Count One of the indictment charges that between January 1, 2002, and August 31, 2004, all defendants conspired to distribute more than five kilograms of cocaine and more than fifty grams of cocaine base ("crack"). Counts Two and Three charge that on December 20, 2002, defendants Dale and Johnson used a firearm during a drug-trafficking crime, and in so doing, murdered Anthony Rios and Olivia Raya. Count Four charges only defendant Burton.

The case was initially treated as a capital prosecution in that the matter was submitted to the Department of Justice for a determination as to whether the death penalty would be authorized. On January 26, 2007, the government announced that the death penalty was not authorized by the Department of Justice and that the case should be considered non-capital in nature.

On September 11, 2007, an evidentiary hearing was begun on defendant's motion to suppress. Defendant Dale was represented by appointed counsel W. Brian Gaddy. The Government was represented by Assistant United States Attorney Kathleen D. Mahoney. The Government called FBI Special Agent Robert A. Plant, Jr., FBI Special Agent Donald W. Lee, II, and Corporal Steven

Poulter of the Bates County Jail as witnesses. The defense called no witnesses to testify.

The hearing concluded on September 27, 2007. Defendant Dale was again represented by appointed counsel W. Brian Gaddy. The Government was represented by Assistant United States Attorneys Kathleen D. Mahoney and Gregg Coonrod. FBI Special Agent Robert A. Plant, Jr. was called back for additional cross-examination, redirect and recross. The Government also called Mark Schnieders of the United States Marshal's Service and Anthony Smith as witnesses.

## II. FINDINGS OF FACT

The following Stipulation of Facts for Suppression Hearing was presented jointly by the parties as Defendant's Exhibit 1 at the hearing held on September 11, 2007 (Tr. I[1] at 3):

1. Michael Dale was arrested on April 21, 2005, for sale of a controlled substance and possession of a firearm.

2. A federal complaint was filed in the United States District Court for the Western District of Missouri on April 22, 2005, against Mr. Dale as a result of his arrest on April 21, 2005.

3. As a result of his arrest and the filing of the federal complaint, Mr. Dale [was] detained in federal custody and has never been released from custody after his April 21, 2005, arrest.

4. Mr. Dale was charged by grand jury indictment on May 20, 2005, with one count of distribution of 50 grams or more of cocaine base and one count of felon in possession of a firearm.

5. Mr. Dale was charged by superseding indictment, filed on September 29, 2005, with one count of conspiracy to distribute 50 grams or more of cocaine base, two counts of distribution of 5 grams or more of cocaine base, one count of felon in possession of a firearm and a forfeiture count. The Western District of Missouri case number for these criminal proceedings was 05-00195-01-CR-W-HFS.

6. At the time of the August 30, 2005, recorded conversation at issue in this case, Mr. Dale was in federal custody for case no. 05-00195-01-CR-W-HFS.

7. At the time of the August 30, 2005, recorded conversation at issue in this case, Mr. Dale was represented by Dan Ross and Ray Sousley in case no. 05-00195-01-CR-W-HFS.

8. On August 16, 2005, the Government sent a proposed *Kastigar* proffer letter to Dan Ross discussing ground rules for a potential proffer of Mr. Dale. The Government also sent on August 16, 2005, a proposed plea agreement to Mr. Dale's counsel.

---

[1] "Tr. I" refers to the transcript of the hearing held on September 11, 2007.

9. No proffer interview of Mr. Dale ever occurred.

10. Mr. Dale entered pleas of guilty on January 27, 2006, without a written plea agreement in case no. 05-00195-01-CR-W-HFS.

(Defendant's Ex. 1)

On the basis of the evidence adduced at the evidentiary hearing held on September 11 and 27, 2007, the undersigned submits the following additional proposed findings of fact:

11. Special Agent Robert A. Plant, Jr. testified that he was involved in the investigation of the homicides of Anthony Rios and Olivia Raya. (Tr. I at 6) Anthony Smith, a federal prisoner, gave information about a potential suspect, i.e. Michael Dale, in those homicides. (Tr. at I at 6) Smith testified that he told the police that Michael Dale had come to him and told him that he was involved in the murders. (Tr. II[2] at 52) According to Smith, Dale told him about the murders of Anthony Rios and Olivia Raya in 2003, when they were both out of custody. (Tr. II at 58) Smith testified that he and Dale had been friends for about 17 or 18 years. (Tr. II at 53) According to Smith, he and Dale were best friends during the period of 2003 to 2005. (Tr. II at 53) Smith testified on direct that he held no grudge or ill will towards Dale. (Tr. II at 53)

12. Anthony Smith was in federal custody for being a felon in possession of a firearm. (Tr. I at 13) Smith had prior drug convictions. (Tr. I at 16-17) Smith had been sentenced in 2004 on the felon in possession charge to 94 months. (Tr. I at 13-14) Smith was serving his sentence at the Greenville Federal Confinement Facility in Greenville, Illinois, and was brought back to the Western District of Missouri for the cooperation efforts in this case. (Tr. I at 14; Tr. II at 74) Other than the felon in possession case for which he had been sentenced in 2004, Smith has never had any other case in the Western District of Missouri. (Tr. II at 60) Smith was interviewed by Detective Gary Gibson and Detective Mike Jones at CCA on July 1, 2005, so he was probably brought back to the Western District of Missouri in the early summer of 2005. (Tr. I at 14-15) During the July 1 interview, Smith told the detectives that he had gone to jail for something that he and Michael Dale had done, but Dale did not go to jail. (Tr. I at 18) Smith also told the detectives that when he was released from jail on that instance, he felt that Dale should have paid him some money for not snitching on him. (Tr. I at 19) However, Smith testified that he did not seek revenge or want to get even with Dale over this incident. (Tr. II at 54) One reason that Smith came forward with information about Dale was that Smith's brother's name was coming out as someone involved in the homicide and Smith wanted to clear his brother's name.[3] (Tr. I at 19-21) Another reason that Smith gave for coming forward with information was that he wanted to help out his brother who had gotten into some trouble at another institution. (Tr. I at 20)

---

[2]"Tr. II" refers to the transcript of the hearing held on September 27, 2007.

[3]According to Special Agent Plant, Anthony Smith, himself, had circulated his brother's name at CCA as someone who had committed the crime in question. (Tr. I at 19-20) Smith testified that when he talked about "his brother" at CCA, he was referring to Michael Dale. (Tr. II at 68)

3

13. After Anthony Smith's initial interview with Detectives Gibson and Jones, Special Agent Plant sat down and talked with Smith about Michael Dale.[4] (Tr. I at 22) Smith believed that he could have Dale make admissions while being recorded. (Tr. I at 7; Tr. II at 53) Special Agent Plant testified that he did not note any animosity or ill will between Anthony Smith and Michael Dale when he spoke with Smith. (Tr. II at 17) Special Agent Plant arranged to have Smith transported with Dale to federal court from the Bates County Jail. (Tr. I at 7) The transportation of both Smith and Dale was arranged to take place on a date when Dale was already going to court on his drug case, that is August 30, 2005.[5] (Tr. I at 7)

14. Along with the FBI, Detective James Svoboda, Mark Schnieders with the United States Marshal's Service and Terry with the Bates County Sheriff's Office were involved in the planning for making the tape recording. (Tr. II at 9) Government counsel had to obtain the approval of the Department of Justice's Office of Enforcement Operations ("OEO") before "wiring" a prisoner. (Tr. I at 33-34; Tr. II at 10) No one discussed obtaining court approval for making the transport and tape recording. (Tr. II at 10-11) Special Agent Plant testified that he knew that Michael Dale was in federal custody on an unrelated drug charge and that he was represented by counsel. (Tr. II at 11) Mark Schnieders testified that the policy of the Marshal's Service allowed consensual monitoring between two federally incarcerated inmates as long as there was OEO approval. (Tr. II at 20)

15. The plan was to have Anthony Smith talk to Michael Dale on the way back from Kansas City to the Bates County Jail and have Smith explain why he had gone to the courthouse. (Tr. II at 13)

16. Special Agent Donald W. Lee, II, testified that on August 30, 2005, he went down to Bates County and rode in the van with a deputy (Corporal Steve Poulter) to transport two prisoners, Michael Dale and Anthony Smith. (Tr. I at 41, 43-44, 46) Special Agent Lee wore a Bates County Sheriff's t-shirt and pants just like the deputies wear. (Tr. I at 42) Special Agent Lee was aware that the plan was to try and get a recorded conversation of Michael Dale. (Tr. at 42) Special Agent Lee's primary mission was to watch for any potential problems with Michael Dale or Anthony Smith. (Tr. I at 42) Special Agent Lee could hear mumblings from the back of the van, but he could not make out what was being said. (Tr. I at 42) There is some sort of a partition between the driver's area and the prisoners' area of the

---

[4]Special Agent Plant originally testified that he spoke with Smith on four or five occasions prior to the recorded conversation. (Tr. I at 22) Special Agent Plant later corrected this testimony and stated that he believes he only spoke with Smith once prior to the recorded conversation, on August 19, 2005, and on four or five occasions total throughout the whole investigation. (Tr. I at 37-40)

[5]While Michael Dale had a pretrial conference set for August 30, 2005, this conference was cancelled when the Court was advised that Dale had a change of plea hearing scheduled. (Tr. I at 28-30) The docket sheet shows that on August 29, 2005, a notice was sent out scheduling a change of plea hearing for September 9, 2005. (Tr. I at 32) Upon cancelling the hearing, the Court would have called the marshals and directed them not to bring Dale in. (Tr. I at 30) Government counsel advised that the plan to transport Smith with Dale was put in place more than one day ahead of time. (Tr. I at 33) According to Government counsel, the marshals gave the government permission to bring Dale in that day. (Tr. I at 35)

4

van. (Tr. I at 42) If someone had raised their voice or called for help, Special Agent Lee would have been able to hear it. (Tr. I at 42) Nothing like that occurred. (Tr. at 42) There was no kind of physical altercation. (Tr. I at 42)

17. Corporal Poulter testified that Michael Dale was not under the influence of any alcohol or illegal narcotics on August 30, 2005. (Tr. I at 48) Corporal Poulter was aware that Anthony Smith would be wearing a recording device. (Tr. I at 48) Corporal Poulter first learned that the trip on August 30 was going to be a situation where a monitoring device was going to be used the night before the trip took place. (Tr. I at 51) It was Corporal Poulter's understanding that there would be a recording device in the van itself recording the conversation between Dale and Smith from Bates County to Kansas City[6] and that a recording device would be on Smith's person to record the conversation on the trip from Kansas City back to Bates County. (Tr. I at 53-54) Corporal Poulter was on the alert for potential trouble between Dale and Smith. (Tr. I at 48) Corporal Poulter did not observe any trouble or hear any raised voices. (Tr. I at 48-49)

18. When Michael Dale and Anthony Smith arrived at the federal courthouse, Smith was taken to the United States Attorney's Office. (Tr. I at 7) Recording equipment was placed on Smith. (Tr. I at 7) The recording equipment was activated right before Smith was turned over to the United States Marshals. (Tr. I at 7-8) The Marshal's Service's call-up sheet for August 30, 2005 shows that Smith was scheduled for an initial appearance in front of Judge Maughmer. (Tr. II at 36-37; Government's Ex. 4) However, Smith did not have any court appearance on August 30, 2005; that was a ruse. (Tr. II at 16) Smith testified that he did not appear before Judge Maughmer on August 30, 2005. (Tr. II at 60)

19. As set forth above, Michael Dale's court appearance which had been set for August 30, 2005, had been cancelled. Special Agent Plant testified that he found out through the Marshals (i.e. Mark Schnieders) that Dale had actually met with his attorney at the courthouse on August 30, 2005. (Tr. II at 15) Mark Schnieders testified that the call-up sheet for August 30, 2005, shows that Dale was brought to the courthouse for an "MA," that is a meeting with attorney. (Tr. II at 21; Government's Ex. 4) Mr. Schnieders believes that after Dale's pretrial conference was cancelled, Dale's attorneys still wanted to talk to him and that they preferred to talk to him in the cell block in lieu of driving down to the jail.[7] (Tr. II at 21-22) The Prisoner Schedule print-out shows that Dale had a meeting with his attorney, Dan Ross, at 11:00 on August 30, 2005. (Tr. II at 22; Government's Ex. 5) Mr. Schnieders testified that the Cellblock Log for August 30, 2005, reflects that Dale met with an attorney. (Tr. II at 24; Government's Ex. 6) An "X" was placed in the spot for Interview Room #2 when Dale went to the interview room and then per policy, the "X" was whited out after Dale was returned to his cell. (Tr. II at 27; Government's Ex. 6) The Record of Visitors to Prisoners in USMS Detention Facilities does not show that an attorney

---

[6]Special Agent Plant testified that there was no conversation on that tape. (Tr. II at 12)

[7]Mr. Schnieders testified that he would not have listed "MA" if Michael Dale was being brought in under a ruse. (Tr. II at 42) Instead, Mr. Schnieders would have brought Dale in for a prisoner transfer to one of the other facilities, with the courthouse cell block being used as the hub to transfer through. (Tr. II at 42)

5

visited Dale on August 30, 2005.[8] (Tr. II at 33-34; Defendant's Ex. 3) Mr. Schnieders testified that this log is in the reception area of the Marshal's Service and while it is posted that anyone visiting prisoners must sign in, it is on the honor system that visitors sign in. (Tr. II at 31, 33)[9] Mr. Schnieders testified that when he ordered the transport of Michael Dale on August 30, 2005, from Bates County to the courthouse, he was acting at the direction of an attorney request to meet with their client, rather than at the direction of the FBI or the U.S. Attorneys. (Tr. II at 22) However, Mr. Schnieders does not recall specifically talking to Dale's attorney about scheduling an interview with Dale on August 30, 2005. (Tr. II at 29)

20. Anthony Smith and Michael Dale were transported back to the Bates County Jail. (Tr. I at 8) Smith testified that he was sitting in the back seat of the van and that Dale was in the seat in front of him. (Tr. II at 55) When they talked, Smith was leaning forward and Dale was leaning towards the back. (Tr. II at 55) Smith testified that he did not force Dale to talk to him. (Tr. II at 56) The things Dale said to Smith in the van, which were recorded, were consistent with what Dale had told Smith in 2003. (Tr. II at 59)

21. Special Agent Lee testified that during the van ride, Michael Dale and Anthony Smith were in federal custody. (Tr. I at 44) Dale could not have refused to get on the van. (Tr. I at 44) Both Dale and Smith were handcuffed and shackled for the van ride. (Tr. I at 44) Corporal Poulter testified that there is no way for one inmate to get away from another inmate in the van if they do not want to talk to them or do not want to deal with them. (Tr. I at 51) Dale was not warned that there could be recording devices in the back of the van. (Tr. II at 16) The drive from Kansas City to the Bates County Jail in Butler, Missouri, takes approximately 45 minutes to an hour. (Tr. I at 44) Special Agent Plant followed the van back to Bates County for security reasons. (Tr. I at 8) At the Bates County jail, the FBI recovered the recording equipment that had been placed on Smith. (Tr. I at 8)

22. The recording was delivered to Assistant United States Attorney Kathy Fincham for the purpose of having another AUSA review the conversation that was recorded. (Tr. I at 8) Assistant United States Attorney Kathleen Mahoney did not review the conversation because she was the prosecutor on Michael Dale's drug case. (Tr. I at 9) Ms. Fincham made some redactions to the transcript. (Tr. I at 9) The redacted transcript was then turned over to Ms. Mahoney. (Tr. I at 9)

23. Special Agent Plant testified that throughout the entire tape, Anthony Smith did not make any threats to Michael Dale, Smith did not raise his voice to Dale nor did Smith coerce Dale. (Tr. I at 11) Dale is 5'10" and weighs approximately 210 pounds, while Smith is 5'6" and weighs approximately 140 pounds. (Tr. I at 12)

---

[8]Mr. Schnieders testified that he has spoken with Dan Ross and that Mr. Ross does not have a recollection about August 30, 2005. (Tr. II at 43) Mr. Ross told Mr. Schnieders that he probably has not signed the Record of Visitors every time that he has come in. (Tr. II at 43)

[9]The Record of Visitors shows that only two prisoners, A. Belcher and James Deterding, received visitors on August 30, 2005. (Defendant's Ex. 3) However, the Cellblock Log would suggest (by whited-out "Xs") that in addition to these two prisoners, five other prisoners were taken to interview rooms on August 30, 2005. (Government's Ex. 6)

24. Detention orders, in conformity with the Bail Reform Act, generally have a provision that indicates if a defendant is committed to the custody of the Attorney General for confinement in a corrections facility, he is to be separated to the extent practicable from persons awaiting or serving sentences or being held in custody pending appeal. (Tr. II at 41) Mr. Schnieders was aware that Anthony Smith was a sentenced prisoner serving his time who was brought back to Kansas City as part of this investigation. (Tr. II at 48-49) Despite the Court's directive, Anthony Smith and Michael Dale were housed in the same facility. (Tr. II at 48) Further, there were two other prisoners transported to Kansas City from the Bates County Jail on August 30, 2005. (Tr. II at 51; Government's Ex. 4) Mr. Schnieders testified that he would assume that since there were only four prisoners and the vans hold 13 passengers, only one van would have been used that day to transport prisoners from the Bates County Jail. (Tr. II at 51) However, the individuals involved in the transport of Bates County prisoners testified that only Michael Dale and Anthony Smith were in the van on August 30, 2005. (Tr. I at 43-44)

25. Anthony Smith received a Rule 35 motion for his cooperation in this case. (Tr. I at 16) Smith testified that he served three and one-half years of his 94-month sentence. (Tr. II at 61) Smith also received $20,000 in reward money from the TIPS hotline in connection with his cooperation in this case. (Tr. II at 65) Smith is released at this time and on probation. (Tr. I at 16)

### III. DISCUSSION

Defendant Dale seeks to suppress the tape-recorded statements made by Dale to Anthony Smith who was serving as an undercover government actor. (Defendant Dale's Motion to Suppress Statements at 1) In support of the motion, defendant argues that said statements were acquired in violation of the defendant's right to due process of law as guaranteed by the Fifth Amendment, as well as his right to counsel under the Sixth Amendment. (Id.) Defendant further argues that the statements were involuntary in violation of the Fifth Amendment. (Id.)

A.  The Sixth Amendment Right To Counsel

The Supreme Court has held that the Sixth Amendment right to counsel attaches "at or after the initiation of adversary judicial criminal proceedings – whether by way of formal charge, preliminary hearing, indictment, information, or arraignment." Kirby v. Illinois, 406 U.S. 682, 688-89 (1972). Accord United States v. Ingle, 157 F.3d 1147, 1151 (8th Cir. 1998); United States v. Moore, 122 F.3d 1154, 1155 (8th Cir. 1997), cert. denied, 522 U.S. 1135 (1998); United States v. Bryson, 110 F.3d 575, 582 (8th Cir. 1997). Under the Sixth Amendment, the Government is prohibited from deliberately eliciting incriminating evidence from an accused "after he ha[s] been

7

indicted and in the absence of his counsel." Massiah v. United States, 377 U.S. 201, 206 (1964).

In United States v. Grego, 724 F.2d 701 (8th Cir. 1984), the Eighth Circuit Court of Appeals dealt with the issue of whether defendants' statements to an informant should be suppressed. Eight days after being indicted on drug conspiracy charges in Georgia, the defendants in Grego were tape recorded by a government informant concerning their efforts to import marijuana into Arkansas. While the Eighth Circuit rejected the defendants' claim that their statements should be suppressed in the Arkansas prosecution, it stated: "It is clear under Massiah that the taped conversation could not have been used in defendants' Georgia trial." Id. at 703. The Eighth Circuit affirmed the district court's refusal to apply Massiah to exclude the tape because "[w]hen the tape of the conversation was made, [the defendants] had not been indicted on any offense for which the tape was later used against them." Id.

The Supreme Court has made clear that the Sixth Amendment right is "offense specific" and "cannot be invoked once for all future prosecutions ...." McNeil v. Wisconsin, 501 U.S. 171, 175 (1991). Accordingly, when investigating new or ongoing criminal activity for which an accused has not been indicted, the Government does not violate the Sixth Amendment. Id. at 175-76. The Government may interrogate an accused about unrelated, uncharged offenses to which the right of counsel has not yet attached. See Moran v. Burbine, 475 U.S. 412, 431 (1986). "Such statements, even though deliberately elicited by government agents after indictment and in the absence of counsel, may form the basis for a separate indictment and may be offered to prove such additional charges." United States v. Grego, 724 F.2d 701, 703 (8th Cir. 1984).

Defendant Dale argues that the specific facts of this case are distinguishable from the Massiah line of cases. Defendant argues:

> In particular, Mr. Ross and Mr. Sousley represented Michael Dale in connection with his pending 2005 drug charge. During their representation, the Government forwarded a proffer letter to defense counsel inviting a proffer session. The proffer session required a discussion of any and all activities, which would have included Mr. Dale's knowledge (or lack of knowledge) of the shootings in question. Implicit in the conversations between government counsel and defense counsel was that Mr. Ross and Mr. Sousley would represent Mr. Dale on any other matters involved in the proffer session. The particular facts of this case are thus distinguishable from the

8

> Massiah Sixth Amendment cases. The recorded statement was obtained in violation of ... Mr. Dale's right to counsel guaranteed by the Sixth Amendment.

(Defendant Dale's Motion to Suppress Statements at 5) Contrary to defendant's argument, "the suggestion that the existence of an attorney-client relationship itself triggers the protections of the Sixth Amendment misconceives the underlying purposes of the right to counsel." Moran v. Burbine, 475 U.S. 412, 430 (1986). The Sixth Amendment right to counsel "becomes applicable only when the government's role shifts from investigation to accusation." Id. Defendant Dale had not been indicted for the murders of Anthony Rios and Olivia Raya at the time the tape-recording took place. Therefore, defendant's Sixth Amendment right to counsel was not violated.

At the hearing held on September 11, 2007, defense counsel conceded that the law is not in favor of defendant on the issue of a violation of the Sixth Amendment right to counsel. (Tr. I at 5) Defense counsel asks that the Court "consider perhaps extending the law in that regard." (Tr. I at 5) This Court's role is not to "extend the law," but to apply existing law to the facts before it. Thus, defendant's argument that his Sixth Amendment right to counsel was violated must fail.

### B. The Fifth Amendment Right to Due Process of Law

Defendant initially argued that his right to due process of law as guaranteed by the Fifth Amendment to the United States Constitution was violated when the Government initiated contact with him without his attorney being present and in a setting that was inherently unfair and unreliable. (Defendant Dale's Motion to Suppress Statements at 5-6) As set forth by the Government,[10] the Eighth Circuit Court of Appeals has consistently approved of the investigative tool of obtaining, in the absence of counsel, tape-recorded admissions by a suspect who has not yet been indicted on the charges being investigated. See United States v. Ingle, 157 F.3d 1147, 1151-52 (8th Cir. 1998); United States v. Grego, 724 F.2d 701, 703 (8th Cir. 1984); United States v. Fitterer, 710 F.2d 1328, 1333 (8th Cir.), cert. denied, 464 U.S. 852 (1983). Further, the Eighth Circuit has specifically rejected the claim that federal authorities violate ethical standards when they authorize

---

[10] (Government's Suggestions in Opposition to Defendant's Motion to Suppress Statements at 7)

9

the surreptitious tape-recording of a subject who has retained counsel, but who has not yet been indicted. See Fitterer, 710 F.2d at 1333.

In supplemental suggestions, defendant argued that an issue emerged during the suppression hearing that is directly pertinent to the due process claim, i.e. the Government's violation of the Court's detention order in Case No. 05-00195-01-CR-W-HFS in obtaining the tape recording at issue. (Defendant Dale's Supplemental Suggestions in Support of Motion to Suppress Statements at 1-2) According to defendant, the Government violated the following two directives of the detention order:

> The defendant be committed to the custody of the Attorney General for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal; and

\* \* \*

> That, upon an order of a court of the United States, or upon request of an attorney for the Government, the person in charge of the corrections facility in which the defendant is confined deliver the defendant to the United States Marshal for the purpose of an appearance in connection with court proceedings[11].

(See Defendant Dale's Supplemental Suggestions in Support of Motion to Suppress Statements at 2-7 and Ex. A at 4) By violating the detention order, defendant argues that the Government has violated his right to due process of law and to a fair trial. (Id. at 6-7)

The Court agrees that the directive that defendant Dale be confined separately, to the extent practicable, from persons serving sentences was violated when Anthony Smith was housed at the Bates County Jail and transported in the same van as defendant Dale. The legislative history of the Bail Reform Act of 1984 suggests that the language that pretrial detainees be confined separately from persons awaiting or serving sentences, "to the extent practicable," was intended to allow flexibility in light of space constraints, not to accommodate government investigative techniques[12].

---

[11] 18 U.S.C.§§3142(i)(2) and 3142(i)(4) require these directives to be included in every detention order issued under 18 U.S.C. § 3142(e).

[12] "Whether a separation of the detained person from persons already convicted will be practical is to be gauged in light of existing facilities. The Committee emphasizes that this provision is not intended to be used to require the construction of new detention facilities or

While the Government would argue that "it is virtually impossible if not actually impossible, to keep sentenced prisoners separate from those awaiting trial,"[13] in this instance, there was no reason to transport Dale and Smith in the same van other than that the Government was providing an opportunity for Smith to get Dale to make admissions. (See Fact Nos. 13, 15 and 16, supra)

The evidence also suggests that the second directive may have been violated as well. The language of the order directs the correction's facility in which the defendant is confined, upon an order of the Court or upon request of Government counsel, to deliver the defendant to the United States Marshal for court appearances. While the language does not state that this is the only or exclusive instance in which the corrections facility may deliver the defendant to the United States Marshal, the order was not intended to allow Government counsel to direct that a defendant be transported for an investigative purpose unbeknownst to the Court and defense counsel. Nor is the Court aware of any other situation in which government counsel has taken the position that the Court's standard order may be interpreted in this way.

It appears that defendant Dale did not, in fact, have a court appearance on August 30, 2005,[14] however, evidence was presented that Dale may have been brought to the courthouse to meet with his attorney. The evidence as to whether defendant Dale actually was brought to the courthouse for the purpose of an attorney meeting, if so at whose request and whether such a meeting occurred is far from clear.[15] The Court is troubled by the records maintained by the United States Marshal's

---

renovation of existing facilities." Senate Report 98-25 (1984) as reprinted in 1984 U.S.C.C.A.N. at 3208 ftn. 77.

[13](Government's Supplemental Suggestions in Opposition to Defendant's Motion to Suppress Statements at 4)

[14]While defendant Dale originally had a pretrial conference set for August 30, 2005, this conference was cancelled when the Court was advised that Dale had a change of plea hearing scheduled. (See Fact No. 13 at n. 4, supra)

[15]For example, Mr. Schneiders testified that he believed that Dale's attorney still wanted to talk to his client after the pretrial conference was cancelled. However, Mr. Schneiders did not specifically recall talking to Dale's attorney about scheduling an interview. (See Fact No. 19, supra) When asked who requested that defendant Dale be brought to Court on August 30, 2005, government counsel indicated that they had the permission of the OEO and that she could not

11

Service. While some of the records suggest that Dale was brought in to meet with his attorney (i.e. the call-up sheet (Government's Ex. 4) and the Prisoner Schedule print-out (Government's Ex. 5)) and that such a meeting occurred (i.e. the Cellblock Log (Government's Ex. 6)), other records suggest that Dale did not meet with anyone (i.e. the Record of Visitors to Prisoners (Defendant's Ex. 3)). The Court finds that it cannot rely upon the Record of Visitors to Prisoners and/or the Cellblock Log. The Record of Visitors to Prisoners is located in the reception area of the Marshal's Service and visitors sign in on the "honor system." (See Fact No. 19, supra) On the date in question, only two visitors signed the Record of Visitors to Prisoners, while the Cellblock Log would suggest that seven prisoners had visitors. (See Fact No. 19 at n.9, supra) The Court further finds that it cannot rely upon the Marshal's Service's call-up sheet as the call-up sheet for August 30, 2005 stated that Anthony Smith was scheduled for an initial appearance in front of Judge Maughmer when, in fact, Smith did not have any court appearances scheduled for August 30, 2005 as he had no case pending in the Western District of Missouri at that time. (See Fact No. 18, supra)[16]

   The Government argues that even if there was a technical violation of the Court's detention order, the violation does not mandate suppression of the statement. In United States v. Clarke, 110 F.3d 612, 615 (8th Cir. 1997), the Eighth Circuit Court of Appeals held that where there is a violation of a federal law associated with a defendant's statement, the court must look to the violation as one of several matters that must be considered in evaluating whether the statement was voluntary. Id. In Clarke, the defendant was not taken before a magistrate judge in a timely manner as required by Rule 5(a) of the Federal Rules of Criminal Procedure. Instead, the defendant was arrested on a "pick-up order" for violation of federal law, detained for approximately twelve hours, questioned

---

recall what had transpired to cause the defendant to be brought to Court, but that "[i]t's very well that they could have brought him anyway because the plan was already in place." (Tr. I at 33-34)

  [16] The reliability and accuracy of the records of the Marshal's Service was undermined once it was established that at least one false entry had been made.

12

Case 4:06-cr-00074-DW   Document 171   Filed 11/07/07   Page 12 of 15

by a United States Secret Service agent for approximately two hours, returned to the detention unit and later released. Id. at 613-15. The defendant did not appear before a magistrate judge until she was indicted approximately three months later. Id. at 613. The court found that other than the twelve-hour delay between the defendant's arrest and her release, there was no evidence that her confession was anything other than voluntary. Id. at 615. Since the violation of Rule 5(a) did not tend to undermine the voluntariness of the defendant's statement, the statement should not have been suppressed. Id.

A court's failure to suppress evidence or impose any penalty once it has been made aware of the violation of one of its orders and the deliberate falsification of records pertaining to federal prisoners, creates the appearance that the court has abdicated its position as a neutral and detached officer of the judicial branch of government, and improperly aligned itself with the investigative arm of law enforcement, a part of the executive branch of government. This appearance of impropriety can only undermine the public's confidence in the fairness and impartiality of the judicial process. Not surprisingly, the undersigned could find no case where an issue was raised as to the admissibility of evidence gained through similar investigative techniques. Thus, the Court is left to apply the reasoning advanced by the Eighth Circuit in Clarke, which the undersigned does not believe provides sufficient precedent on which to recommend the suppression of the evidence at issue in this case. C. Voluntariness of Statement

Defendant Dale argues that the statements made in this case were involuntary in that his will was overborne by coercive police activity. (Defendant Dale's Motion to Suppress Statements at 6) According to defendant, he had no choice but to endure the conversation with Anthony Smith as he was not free to leave the van. (Id. at 7) Defendant further argues the fact that Smith was the interrogator also imposed undue and coercive pressures due to the fact that Smith had a grudge against Dale. (Id.) Finally, defendant argues that the prison environment can cause inmates to recount or invent past violent acts to make them appear tough to other inmates. (Id. at 7-8)

As set forth in United States v. Ingle, 157 F.3d 1147, 1150 (8th Cir. 1998), "[w]hen a

13

defendant's will is overborne by coercive police activity, the resulting confession is inadmissible." The court must look to the totality of the circumstances to determine whether a confession is voluntary. See United States v. Santos-Garcia, 313 F.3d 1073, 1079 (8th Cir. 2002). In this case, defendant Dale allegedly told Anthony Smith about the murders of Anthony Rios and Olivia Raya in 2003, when they were both out of custody. (See Fact No. 11, supra) Smith's motivation for agreeing to participate in the tape-recording, be it that he held a grudge against Dale, that he wanted to clear his brother's name or that he wanted to reduce his own sentence, is unclear. However, no evidence was presented to suggest that Smith threatened or intimidated Dale to get him to talk in the van. Rather, Smith testified that he did not force Dale to talk to him. (See Fact No. 20, supra) Special Agent Plant also testified that Smith did not threaten Dale, raise his voice to Dale nor coerce Dale. (See Fact No. 23, supra) The transcript of the conversation between Dale and Smith gives no indication that Dale felt intimidated by Smith or by his surroundings. Dale and Smith had been friends for 17 or 18 years. (See Fact No. 11, supra) Smith testified that Dale leaned back in order to talk to Smith who was in the back seat of the van. (See Fact No. 20, supra) Even though Dale could not "walk away" from Smith, he was free to terminate the conversation at any time. "The fact that the government encouraged the conversation, and [Dale's] attempt to pass off his incriminating statements as 'jailhouse bluster,' do not establish the kind of coercive police activity that renders a confession involuntary." Ingle, 157 F.3d at 1150.

## IV. CONCLUSION

For the reasons set forth above, it is

RECOMMENDED that the Court, after making an independent review of the record and applicable law, enter an order denying Defendant Dale's Motion to Suppress Statements (doc #111).

Counsel are reminded they have ten days from the date of receipt of a copy of this Report and Recommendation within which to file and serve objections to same. A failure to file and serve objections by this date shall bar an attack on appeal of the factual findings in this Report and Recommendation which are accepted or adopted by the district judge, except on the grounds of plain

14

error or manifest injustice.

                                         */s/ Sarah W. Hays*
                                              SARAH W. HAYS
                                 UNITED STATES MAGISTRATE JUDGE