IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.06-00074-01-CR-W-DW |
| | ) | |
| MICHAEL DALE, | ) | |
| aka: "Gin" | ) | |
| | ) | |
| Defendant. | ) | |

**RESPONSE TO DEFENDANT'S MOTION FOR NEW TRIAL AND/OR MOTION FOR
JUDGMENT OF ACQUITTAL**

Comes now the United States of America by and through United States Attorney John F.

Wood, and Assistant United States Attorneys Kathleen D. Mahoney and Gregg R. Coonrod, for

the Western District of Missouri, and in response to defendant Dale's Motion for New Trial and

Motion for Judgment of Acquittal states as follows:

**Procedural Background**

On December 3, 2007, after six days of trial, defendants Michael Dale and

Dyshawn Johnson were convicted of conspiracy to distribute five kilograms or more of cocaine

in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) and 846 (Count One); and knowingly using and

carrying a firearm during and in relation to a drug trafficking offense and committing first-degree

murder, in violation of 18 U.S. C. §§ 924(c)(1), (j)(1) and (2) (Counts Two and Three). The

Government proved that defendants conspired to distribute cocaine in an amount of five

kilograms or more, and during the course of that conspiracy used a firearm to murder Anthony

Rios and Olivia Raya.

On January 7, 2008, Dale timely filed his Motion for New Trial and/or Motion for Judgement of Acquittal.

## I.  Argument

**1.      Motion for Judgment of Acquittal Based on Insufficiency of the Evidence**

**A.      Legal Standard**

Motions for acquittals are not favored, as it is well-settled that "jury verdicts are not lightly overturned."  *United States v. Hood*, 51 F.3d 128, 129 (8th Cir. 1995).  Rather, significant restraint is placed on a district court's authority to overturn a jury's verdict.  *United States v. Gomez*, 165 F.3d 650, 654 (8th Cir. 1999).  The Eighth Circuit has therefore held that, "[t]he jury's verdict must be upheld if there is an interpretation of the evidence that would allow a reasonable jury to find the defendant guilty beyond a reasonable doubt."  *United States v. Moore*, 108 F.3d 878, 881 (8th Cir. 1997).

 In his motion, Dale contends that the Government's evidence at trial was insufficient to establish commission of the elements of the offenses charged.  In considering a motion for judgment of acquittal based on the sufficiency of the evidence to sustain a conviction, the court must examine "the evidence in the light most favorable to the jury verdict and giving the verdict the benefit of all reasonable inferences." *United States v. Montano*, 506 F.3d 1128, 1132 (8th Cir. 2006) (citing *United States v. Wintermute*, 443 F.3d 993, 1003 (8th Cir. 2006)).  Under this stringent standard, a verdict will be overturned "only in rare cases."  *United States v. Lee*, 356 F.3d 831, 836 (8th Cir. 2003).  A jury's verdict will be reversed only if no reasonable jury could have found the defendant guilty.  *Montano*, 506 F.3d at 1131 (citing *United States v. Sanders*, 341 F.3d 809, 815 (8th Cir. 2003)).

**B.** **Count One (Drug Conspiracy)**

The Government offered more than sufficient evidence that Dale was part of a cocaine conspiracy with Johnson and others between January 1, 2002, and August 31, 2004. The drug conspiracy first came to light on December 21, 2002, when Anthony Rios and Olivia Raya were found murdered in their home, and evidence at the crime scene showed that Rios was a drug trafficker. Police recovered from the Rios residence more than 1.4 kilograms of cocaine and more than 6.6 kilograms of marijuana, along with scales and other drug distribution items. Additionally, witnesses testified that more than $20,000 in U.S. currency had been in Rios's freezer the night before, but was not found by police. Rios' cell phones were also recovered, and showed numerous phone calls with admitted drug traffickers such as Michael Matthews, Desi Arnau, and Paul Lupercio. These same phones showed that Rios had contact with Johnson on the night of the murders, while Johnson's phone records showed he was in contact with Dale the night of the murders.

The Government presented five witnesses who testified to Dale's involvement in drug trafficking from 2002-2004. Anthony Smith testified he witnessed a cocaine transaction between Dale and Johnson. Charles Levingston and Terry Taylor testified that Dale was their source of cocaine and cocaine base, and that Johnson was Dale's source of cocaine and cocaine base. Mitchell Powell testified that he bought cocaine from Johnson, with Dale acting as a go-between. Bryant Burton, a charged co-conspirator, testified that Dale and Johnson dealt drugs together.

These cooperating witnesses were corroborated by Dale's tape-recorded admissions to Anthony Smith, in which he said, "as much work as I was buying . . . buying halves." (Govt. Exhibit 19b, p. 60.) Smith explained in his testimony that Dale said he was buying

3

½ kilograms of cocaine. Dale's admissions to the murders also linked him back to the physical evidence of drug activity found at the Rios home.

Dale attacks the credibility of the cooperating witnesses, but his attack is misplaced. "It is axiomatic that we do not review questions involving the credibility of witnesses, but leave credibility questions to the jury." *Montano*, 506 F.3d at 1133, (quoting *United States v. Dabney*, 367 F.3d 1040, 1043 (8th Cir. 2004)). "The jury is free to believe the testimony of any witness in its entirety, or to reject that testimony as untrustworthy." *Montano*, 506 F.3d at 1133, (quoting *United States v. One Star*, 979 F.2d 1319, 1321 (8th Cir. 1992)).

As the testimony of the cooperating witnesses was corroborated by Dale's own recorded admissions, his conviction for conspiracy to distribute more than five kilograms of cocaine is supported by more than sufficient credible evidence.

## C.     Counts Two & Three (Firearm Counts)

On December 21, 2002, shortly before 8:00 p.m., Francisco Rios, Anthony Rios' grandfather, went to the home of Anthony Rios and Olivia Raya at 5115 Hardesty, Kansas City, Missouri, to check on them because he had not seen Rios and Raya all day. Mr. Rios, who lived next door, went into the house and found both victims shot to death. Olivia Raya was found in the living room on the couch where she had been writing out thank you cards for graduation gifts (she had graduated from Rockhurst University about one week before she was killed), with a pen still in her hand. Raya had gunshot wounds to her head, neck, and thigh. Anthony Rios was found on his back in the kitchen. He had an intermediate range gunshot wound to his right hand, and two to his head. Analysis of the blood spatter evidence at the scene revealed that both victims had been shot after they were down - Rios on the floor and Raya on the couch on which

4

she had been sitting.  No shell casings were found at the scene, leading detectives to believe that a revolver had been used.  There was no forced entry to the house and nothing seemed to be out of place except one open drawer in the kitchen.

The victims were last seen alive Friday evening, December 20, 2002, at about 7:15 to 7:30 p.m. when Paul Lupercio stopped by the victims' home to arrange a drug deal with Anthony Rios.  Lupercio also talked to Raya; she gave him a thank you card she had just written out, thanking him for a graduation present.  Phone records show the last call Rios ever made was on December 20, 2002, to a number belonging to Dyshawn Johnson, aka "Chopper ."  Rios did not make or answer any calls after the call to Johnson.  Johnson called Rios a total of six times on December 20, while Rios called Johnson a total of five times that day.  Police later discovered that Johnson bought a plane ticket on December 20; he flew to Los Angeles the next day, December 21, 2002.

Although the case remained unsolved for two and a half years, detectives kept investigating.  In July 2005, Anthony Smith, who was serving a federal sentence, revealed to police that when he got out of prison in 2003, he asked Michael Dale, aka "Gin," what was his thing now.  Dale responded that murder was his thing and that he "had two bodies."

Smith said that Dale admitted he killed the Hispanic couple on Hardesty (Rios and Raya). Dale told Smith that a drug deal was set up with Rios but it was actually planned to rob Rios. Dale told Smith that he first shot Rios in the kitchen and that he then shot Raya.  Dale said they took approximately two and a half kilograms of cocaine from the scene.  Smith told detectives that he thought Dale would talk to him again about the murders.  On August 30, 2005, Smith

5

wore recording equipment, and Dale made several admissions on tape implicating himself in the murders and drug robberies.

The following are excerpts from the tape which were consistent with the evidence and planned concealment of the crimes:

1.    **Dale:**  **"They ain't got no motherfuckin' prints with me and another person on nothin'."** (Govt. Exhibit 19b, p. 30.)

2.    **Dale:**  **"But this murder it get beat, cuz. You don't have no murder weapon. You don't have no witness. You ain't got no DNA."** (Govt. Exhibit 19b, p. 32.)

3.    **Dale:**  **"They'll run off there lie, Cuz. Can't leave no witness, witnesses alive. They'll make it, they'll prep 'em."**

    Smith: "Mmm. hmm."

    **Dale:**  **"That's why the case is so beautiful and they hate it."** (Govt. Exhibit 19b, p. 38.)

4.    **Dale:**  **"When the bitch heard the noise. Pop! Pop! She played it off."** (Govt. Exhibit 19b, p. 66.)

5.    **Dale:**  **"I didn't leave no shells in the house."** (Govt. Exhibit 19b, p. 66.)

6.    **Dale:**  **(speaking of Rios) "You have no business letting nobody in your house."** (Govt. Exhibit 19b, p. 69.)

Mitchell Powell said that one day he was talking to Dale and said that was messed up, Snap (Rios) getting killed. Dale responded that he had murdered Snap. Dale told Powell that Rios let them in the house and that he shot Rios and his wife.

Bryant Burton (aka "Paint"), pled guilty to the drug conspiracy charged in Count One and testified. He testified he moved from Los Angeles to Kansas City, Missouri, in the 1990's along

with Johnson in order to set up their drug business in Kansas City. Burton testified that both he and Johnson were supplied drugs by Rios. Burton said after the murders, he talked with both Dale and Johnson, who both admitted to him that they killed Rios and Raya. Burton first talked to Dale, who admitted the murders to Burton. Dale also told Burton that he, "had to get paid," and "[i]t could happen to any one of us."

As noted above, un-controverted phone records showed that Rios and Johnson were in frequent contact the day of the murders, and in fact the last phone call Rios ever made was to Johnson. Phone records also showed Johnson and Dale calling each other the day of the murders, but as Dale noted in his conversation with Anthony Smith, Dale's number did not show up on Rios's phone.

In a challenge to sufficiency of the evidence, "[o]nly if 'no interpretation of the evidence . . . would allow a reasonable-minded jury to conclude guilt beyond a reasonable doubt' will we reverse a jury's verdict on the grounds of insufficient evidence." *United States v. Oslund*, 453 F.3d 1048, 1059 (8th Cir. 2006) (quoting *United States v. Skinner*, 433 F.3d 613, 615 (8th Cir. 2006). In a similar challenge to sufficiency of the evidence, the Eighth Circuit in *Oslund* held that taped admissions between the defendant and a cooperating witness, plus testimony from other associates of the defendant that he confessed to them, was sufficient to uphold the murder conviction. *Oslund*, 453 F.3d at 1060.

7

**A.**     <u>Legal Standard</u>

Motions for new trials are generally disfavored, *United States v. Campos,* 306 F.3d 577, 579 (8th Cir. 2002), and will be granted only where "a serious miscarriage of justice may have occurred," *United States v. Huerta-Orozco,* 272 F.3d 561, 565 (8th Cir. 2001).

**B.**     <u>Sufficiency of the Evidence</u>

The Government incorporates its arguments as to the sufficiency of the evidence from the above sections **I.B.** and **I.C.**

**C**.     <u>The Tape Recorded Statement</u>

**1.**     <u>Suppression</u>

The Government incorporates into this response all of its previous filings and oral arguments responding to Dale's motion to suppress the tape-recorded statement.

The denial of a motion to suppress is reviewed *de novo*, but the district courts's underlying factual determinations are reviewed for clear error.  *United States v. Martinez*, 358 F.3d 1005, 1008 (8th Cir. 2004).  Dale argues that his statement was involuntary; but the court found otherwise: "[N]o evidence was presented to suggest that Smith threatened or intimidated Dale to get him to talk in the van.  Rather, Smith testified that he did not force Dale to talk to him."  "Even though Dale could not "walk away" from Smith, he was free to terminate the conversation at any time."  Report and Recommendation to Deny Dale's Motion to Suppress, p. 14, Document 171.

This Court's findings, based upon the evidence presented at the suppression hearings, support the conclusion that Dale's statements were voluntary and not the result of coercion or

Case 4:06-cr-00074-BCW   Document 239   Filed 02/01/08   Page 8 of 21

intimidation.  *United States v. Harper*, 466 F.3d 634, 644 (8th Cir. 2006).  The Government

urges this Court to affirm its original holding denying Dale's suppression claims.

> ### 2.    Other Evidentiary Issues with the Statement

Dale also claims that the recorded statement informed the jury that Dale was in custody

on another federal matter which violated his constitutional rights.  However, the jury was not

informed that Dale was in custody on another matter; while the jury could infer that Dale was in

custody, the reason why he was in custody was not in evidence.  The admission of tape

recordings is within the sound discretion of the trial court and will not be reversed unless there

has been an abuse of that discretion.  *Oslund*, 453 F.3d at 1054.

The Government respectfully contends that this Court could well have admitted evidence

of Dale's federal drug and weapon conviction pursuant to Federal Rule of Evidence 404(b).

Evidence is admissible under Rule 404(b) when the crime is:  (1) relevant to a material issue;

(2) similar in kind and reasonably close in time to the crime charged; (3) supported by sufficient

evidence; and (4) such that its probative value is not substantially outweighed by its prejudicial

effect.  *United States v. Ruiz-Estrada*, 312 F.3d 398, 403 (8th Cir. 2002) (citing *United States v.

Hardy*, 224 F.3d 752, 757 (8th Cir. 2000)).  Dale's federal conviction was relevant to prove

intent, common scheme or plan, and knowledge.  The conviction was not just similar in kind, it

was identical, and separated from the pending charges by just a few months rather than years.

Since it was a final conviction, it was supported by more than sufficient evidence.  And finally,

the probative value of a drug conviction is not substantially outweighed by its prejudicial effect,

pursuant to abundant Eighth Circuit case law. *See United States v. Adams,*  401 F.3d 886, 899

(8th Cir. 2005), (citing *United States v. Hill*, 249 F.3d 707, 713 (8th Cir. 2001)); *United States v.*

9

*Thomas,* 398 F.3d 1058, 1062-63 (8th Cir. 2005); *United States v. Mendoza*, 341 F.3d 687, 692 (8th Cir. 2003); *United States v. Loveless*, 139 F.3d 587 (8th Cir.1998); *United States v. Escobar*, 50 F.3d 1414, 1421 (8th Cir. 1995). Dale should be grateful his prior conviction was not admitted pursuant to Rule 404(b), as that would have been far more prejudicial than a mere implication that he was incarcerated at the time of the tape-recorded statement.

Even where a juror sees a defendant in custody, there is not sufficient prejudice to warrant either a mistrial or a new trial. *United States v. Van Chase*, 137 F.3d 579, 583 (8th Cir. 1998). Accordingly, this Court did not abuse its discretion in admitting the recorded statements. **D.**

### Motion to Strike Juror No. 14

After *voir dire*, a panel of twelve jurors and two alternates was seated. On the second day of trial, Juror No. 14 raised a concern with this Court that he might not be able to be fair and impartial. Because the jury had already been selected, this Court asked Juror No. 14 to stay and hear the evidence. Any bias or prejudice issues the juror had would then be revisited before the jury was allowed to deliberate. At that time, this Court did express concern that the two alternates may not be sufficient to see the case to its conclusion. This Court was correct in its assessment of the need for extra jurors, as one juror was excused before deliberations due to the illness of her husband,[1] causing one of the alternates to be seated.

At the conclusion of the evidence, Juror No. 14 was questioned again by this Court about his ability to be fair and he said that he could. He was emphatic in his response to this Court. Neither defense counsel asked any follow-up questions.

---

[1] This juror's husband was hospitalized overnight with chest pains which might have later required surgery.

10

"The decision to excuse a juror for cause and substitute an alternate is vested in the district court's discretion, and will be upheld if the record shows a legitimate basis for the court's decision." *United States v. Gianakos*, 415 F.3d 912, 922 (8th Cir. 2005) (citing *United States v. Campbell*, 845 F.2d 782, 785 (8th Cir. 1988)). In *Gianakos*, it was alleged that a juror was observed mouthing to another juror during the government's presentation of evidence, "he's guilty." *Gianakos*, 415 F.3d at 921. The trial court did not investigate further, but admonished the jurors not to talk about the case before deliberations, and that if any juror had made up their mind as to guilt or innocence, not to share that belief with anyone before deliberations. *Id.* at 922. The Eighth Circuit held that even though the trial court did not investigate the alleged juror misconduct, and even though the trial court misstated the law by instructing the jurors that they could reach a conclusion before all the evidence was presented, the trial court did not abuse its discretion in failing to investigate further or in failing to remove the juror: "[I]n federal criminal cases, we will not overturn the district court's finding that a prospective juror can put aside any pretrial opinion and render a verdict based upon the evidence at trial 'unless the error is manifest.'" *Id.* at 922-23 (quoting *United States v. Blom*, 242 F.3d 799, 805-806 (8th Cir. 2001).

In contrast with the trial court in *Gianakos*, this Court did investigate Juror #14, on two occasions, and properly instructed the jury. Juror #14's unequivocal statement that he could be fair after hearing all the evidence in the case provides a legitimate basis for this Court's decision not to excuse him. *Gianakos*, 415 F.3d at 922.

Post-verdict orders for new trials on account of suspected but unproven juror bias are, and should be, granted only where the probability for juror bias is so great that in fairness it cannot be ignored. *United States v. Dean,* 667 F.2d 729, 732 (8th Cir. 1982). In *Dean*, the Eighth Circuit

11

distinguished between possible prejudice and actual prejudice. Because Dale has failed to establish prejudice, his motion should be denied.

**E.     Gang References**

At the beginning of his testimony, when asked where he worked, Special Agent Robert Plant used the words "gang unit." The remaining testimony by Agent Plant and other officers focused solely on the drug conspiracy and two charged murders, with no further mention of the word "gang" or gang activity. One such inadvertent and innocuous reference to "gang" in an agent's job description as part of a six-day trial with 35 witnesses is a harmless event. *United States v. Hardin* 209 F.3d 652, 664 (7th Cir. 2000) (holding that nine references to gang affiliation that were not probative of guilt were harmless due to their scattered nature over the course of a 12-day trial involving 42 witnesses).

In regard to the alleged "gang" reference on the tape recording, Smith told Dale that the police had questioned him, and related his responses to that questioning, in the following conversation: "Smith: Shhhh, cuz, I don't even know man. Fifty First to Four Tre to Deuce Tre to 12th Street . . . Blood to Crips . . . I said man I don't . . . I said man I've been gone man. I don't . . . I don't know these niggers man. Man I only hung with one nigger man, my bro." (Govt. Exhibit 19b, p. 6.) These statements merely revealed that police had asked Smith some questions, which he did not answer. The references were fleeting, did not mention the word "gang," and did not refer to either defendant's participation in or involvement with any gang, and therefore could not have been prejudicial.

**F.**     **Motion to Sever Based on Co-conspirator Hearsay**

Rule 14, Federal Rules of Criminal Procedure, governs the severance of both defendants and offenses in a single indictment.[2]  A motion for severance is addressed to the discretion of the trial court.  *Zafiro v. United States*, 506 U.S. 534, 541 (1993); *United States v. Shivers*, 66 F.3d 938, 939 (8th Cir.), *cert. denied*, 516 U.S. 1016 (1995).  The United States Supreme Court has held that severance should be granted "only if there is a serious risk that a joint trial would compromise a specific trial right of a properly joined defendant or prevent the jury from making a reliable judgment about guilt or innocence."  *Zafiro*, 506 U.S. at 538.

In order to prevail on a severance motion, a defendant must show not simply prejudice but "clear" or "substantial" prejudice.  *United States v. Mansaw*, 714 F.2d 785, 790 (8th Cir.), *cert. denied*, 464 U.S. 964 (1983); *United States v. Melina*, 101 F.3d 567, 571 (8th Cir. 1996).  Severance will not be granted by a mere showing that a particular defendant may have a better chance of acquittal if severed.  *Zafiro*, 506 U.S. at 539; *United States v. Delpit*, 94 F.3d 1134, 1143 (8th Cir. 1996).  The reasoning for this requirement of "clear" or "substantial" prejudice is founded in the need of society for speedy and efficient trials.  *United States v. Gallo*, 763 F.2d 1504, 1525 (6th Cir. 1985).

---

[2]  Rule 14.  Relief from Prejudicial Joinder

If it appears that a defendant or the government is prejudiced by a joinder of offense or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires.  In ruling on a motion by a defendant for severance the court may order the attorney for the government to deliver to the court for inspection in camera any statements or confessions made by the defendants which the government intends to introduce in evidence at trial.

Case 4:06-cr-00074-BCW   Document 239   Filed 02/01/08   Page 13 of 21

A joint trial "gives the jury the best perspective on all the evidence and therefore increases the likelihood of a correct outcome." *United States v. Darden*, 70 F.3d 1507, 1526-1527 (8th Cir. 1995), *cert. denied*, 517 U.S. 1149 (1996). Additionally, joint trials serve the interests of justice by avoiding "the scandal and inequity of inconsistent verdicts." *Zafiro*, 506 U.S. at 537.

While the Government respects this Court's ruling that all defendants' admissions had to be redacted, the Government still contends that Johnson's statements to Bryant Burton could be considered co-conspirator statements, admissible against both Johnson and Dale. The elements the Government must prove by a preponderance of the evidence to establish co-conspirator statements are: (1) a conspiracy existed; (2) the defendant and declarant were members of the conspiracy; and, (3) the statements were made in the course and furtherance of the conspiracy.

The Government presented evidence that the Dale and Johnson were members of the conspiracy. Numerous witnesses testified that Johnson was Dale's source of cocaine. Further, Burton was a charged co-conspirator who pled guilty to the conspiracy, and testified that the murder victim Anthony Rios supplied both he and Johnson. Burton's later role as a government witness does not affect the admissibility of the statements either Dale or Johnson made to him, as both Dale and Johnson were members of the conspiracy. *See United States v. Frazier*, 280 F.3d 835, 848 (8th Cir. 2002).

Both Dale and Johnson made statements to Bryant Burton, who, along with Johnson, had been supplied drugs by Rios, and had likely distributed some of the drugs taken in the robbery. When he inquired about what had happened to his source, Dale first told Burton that he could have learned that only from Johnson, and then explained that Johnson had set up the robbery of

14

Rios. Burton then went to Johnson to find out Johnson's role in the murder and distribution of drugs taken in the murders. Johnson confirmed Dale's statements and told him that was the way the game was played. Both Dale and Johnson's statements to Burton identified what happened to Burton's source of narcotics, and informed Burton of the nature of the violent drug conspiracy. As such, both defendants' statements are admissible as co-conspirator statements. *See Davis*, 457 F.3d at 825 (co-conspirators' statements that discuss the supply source for the illegal drugs or identify a co-conspirator's role in the conspiracy are considered statements made "in furtherance" of the conspiracy); (quoting *United States v. Arias*, 252 F.3d 973, 977 (8th Cir. 2001)). If Johnson's statement was a co-conspirator statement, then Dale could not have been prejudiced by the method of redaction of Johnson's statement to Burton.

In any case, the statement was redacted to comply with *Bruton*. The redaction complied with the examples cited in *United States v. Edwards*, 159 F.3d 1117, 1125-26 (8th Cir. 1998), *cert. denied*, 528 U.S. 825 (1999) (redactions are proper when co-defendants' name replaced with pronouns or similarly neutral words and did not lead directly to non testifying declarant's co-defendant).

Dale suggests the reference to "another person" was "obviously a purported reference to Michael Dale." However, the use of a neutral pronoun (i.e., "another person" or "someone" ) is not only not prohibited, it is the favored method of redaction. *United States v. Coleman*, 349 F.3d 1077, 1086 (8th Cir. 2003). During trial Burton testified that Johnson told him that Johnson and "another person" went to Rios home and that "he [the other person] went crazy" and "started shooting." Nothing in Burton's testimony facially implicated Dale.

Case 4:06-cr-00074-BCW   Document 239   Filed 02/01/08   Page 15 of 21

Furthermore, *Bruton* error is subject to a harmless-error analysis. *Coleman*, 349 F.3d at 1086 (citing *Edwards*, 159 F.3d at 1128). Dale's recorded admissions to Anthony Smith, along with similar admissions to Charles Levingston, Terry Taylor, Mitchell Powell, and Bryant Burton, provided "overwhelming and largely un-controverted evidence properly before the jury." *Coleman*, 349 F.3d at 1086 (quoting *Brown v. United States*, 411 U.S. 223, 231 (1973)). As the evidence against Dale was strong and largely uncontroverted, any potential *Bruton* error would be harmless beyond a reasonable doubt.

**G.** **Reference to "DeShawn" on Tape Recorded Statement**

Dale claims that one isolated reference to "DeShawn" in the recorded statement prejudiced him; he does not explain how. Based upon this Court's ruling that the tape recording was not a co-conspirator statement, the Government redacted references to Dyshawn Johnson, "Chopper," or "Chop" from the tape. Proposed redactions were given to both defense counsel well before the tape was played. Neither defense counsel lodged any objections to the redactions. During the playing of Dale's tape-recorded statement and the display of the transcript, the following statements were seen and heard by the jury:

> **Dale: "You gotta think about what you ask, cuz. [UI]."**
>
> Smith: "Mmm. hmm."
>
> **Dale: "DeShawn [UI] the only reason I'm going this route cause I already wash my hands of this fucked up nigger."**
>
> Smith: "Right."
> (Govt. Exhibit 19b, p. 62.)

The day after the tape was played for the jury, Johnson's defense counsel objected to the mention of "DeShawn." Because neither Dale nor Johnson objected before the tape was played,

or immediately afterward, the admission of the evidence will be reviewed for plain error.

*United States v. Looking Cloud*, 419 F.3d 781, 785 (8th Cir. 2005). One reference to "DeShawn" during a portion of the conversation that did not reference the murders is not plain error.

Furthermore, defendant Johnson's counsel submitted an instruction on the reference, to which the Government agreed, that "DeShawn" was not a reference to Dyshawn Johnson. In Instruction No. 11, this Court advised the jury that the "DeShawn" mentioned on the tape and whose name was seen in the transcript was not the defendant Johnson. The Eighth Circuit has held that jurors are presumed to follow the court's instructions. "We presume that 'jurors, conscious of the gravity of their task, attend closely the particular language of the trial court's instructions in a criminal case and strive to understand, make sense of, and follow the instructions given them." *United States v. Harper*, 466 F.3d 634, 647 (8th Cir. 2006) (quoting *Francis v. Franklin*, 471 U.S. 307, 326 n. 9 (1985)). The Eighth Circuit accordingly affirmed the convictions in *Harper*, holding that the trial court[3] had correctly instructed the jury. *Harper, supra*.

In Johnson's portion of closing argument, Johnson's counsel Larry Handfield claimed there was "not one piece of evidence that has been introduced in this case that establishes or proves Count 1." Mr. Handfield then went on to attack the credibility of the witnesses without addressing the Government's physical evidence that Johnson dealt drugs. During the Government's rebuttal argument, Assistant United States Attorney Kathleen Mahoney said, "I have been waiting to hear why Dyshawn Johnson is not a drug dealer, how he is not guilty of

---

[3]The trial court was the Honorable Dean Whipple, Chief Judge, Western District of Missouri.

17

Count One." She went on to reply to Mr. Handfield's closing remark regarding the lack of evidence, saying, "It is absolutely false that there is no physical evidence. There is the unexplained income, the kilo wrapper with the cocaine residue on it, the scales."

Neither defense counsel made any objection during the Government's closing argument, nor asked for any curative instruction. Instead, counsel waited until the dismissal of the jury before making a claim that she improperly shifted the burden and requested a mistrial. If defense counsel does not timely object to the prosecutor's remark, the defendant must prove plain error which affects his substantial rights. *United States v. Hance*, 501 F.3d 900, 908 (8th Cir. 2007). When the accusation of improperly shifting the burden to the defendant was finally raised, AUSA Mahoney explained, "Your Honor, I wasn't challenging the defendant to present evidence. Mr. Handfield said in his closing argument that he was going to explain why his client was not guilty of Count 1, . . . I didn't ever hear that argument of why he was not guilty of Count 1, and so that's what I was responding to."

By examining the Government's rebuttal argument in context, it is clear that counsel was responding only to defense counsel's argument, which is proper rebuttal. *United States v. Young,* 470 U.S. 1, 12, 105 S.Ct. 1038, 1041, 84 L.Ed.2d 1 (1985) (the allegation of prosecutor misconduct must be examined in context beyond an isolated statement). The Government has a right to respond to defense arguments. "When the defendant's attorney offers a theory of defense, however, the Government may respond by noting the absence of evidence to support that defense." *United States v. Burns*, 432 F.3d 856, 861 (8th Cir. 2005). In *Burns*, the Eighth Circuit found that Government was not suggesting the defendant had any burden to present evidence when Government counsel argued that the defendant could have had drugs tested before

18

they were destroyed.  However, the Court held that even if the remarks were improper, the defendant did not show that they deprived him of a fair trial, in light of the trial court's instructions explaining the burden of proof.  *Id*. at 861-62.  Government counsel's rebuttal remarks were proper, and even were they not, are not grounds for a new trial as this Court properly instructed the jury.

**I and J.**      **Testimony of Jonni Curry & Evidence of North Kansas City Traffic Stop of Dyshawn Johnson.**

_____In his points I and J, Dale suggests that because he was not mentioned in Jonni Curry's testimony and because he was not present when co-defendant Johnson was arrested in North Kansas City, that the evidence was irrelevant to the charges against him, was prejudicial, and either should have been excluded or was grounds for severance which was previously denied.

This Court is well aware that joint trials are favored where some evidence, even murder evidence, is admissible against some defendants but not others. *United States v. Dierling*, 131 F.3d 722, 734 (8th Cir. 1997) *rehearing for en banc denied* 1998; *Delpit*, 94 F.3d at 1143; *Darden*, 70 F.3d at 1527.  Further, a defendant is not entitled to severance simply because the evidence against a co-defendant is more weighty than the evidence against him or because evidence admissible against a co-defendant may make his case more difficult to defend. *United States v. Willis*, 940 F.2d 1136 (8th Cir. 1991).

During the trial, the Government presented evidence through the testimony of Anthony Smith, Charles Levingston, Mitchell Powell, and Terry Taylor that during the charged time frame Dale and Johnson worked together to distribute cocaine and cocaine base. Since the conspiracy was ongoing at the time of Johnson's North Kansas City arrest and during the time in

19

which Curry described Johnson using her home to stash guns, drugs and money; these acts committed in furtherance of the conspiracy were attributable to all members of the conspiracy. *U.S. v. Ball,* 499 F.3d 890, 897-98 (8th Cir. 2007) (citing *United States v. Pierce,* 479 F.3d 546, 549 (8th Cir.2007)) ("A defendant who has entered into a criminal conspiracy is responsible for offenses committed by fellow conspirators if the defendant was a member of the conspiracy when the offense was committed and if the offense was committed in furtherance of and as a foreseeable consequence of the conspiracy."); *Pinkerton v. United States,* 328 U.S. 640, 66 S.Ct. 1180, 90 L.Ed. 1489 (1946).

Further, this Court provided the applicable jury instruction which directed the jury to consider the evidence against each defendant.[4] *Id.* at 898 (discussing the jury instruction application of the co-conspirator liability doctrine established in *Pinkerton*); *United States v. Pecina*, 956 F.2d 186, 188 (8th Cir. 1992); and *United States v. McConnell*, 903 F.2d 566, 571 (8th Cir. 1990) *cert. denied*, 498 U.S. 1106 (1991). Likewise, this Court, in Instruction No. 12, specifically directed that the jury "must not consider" Jonni Curry's testimony in deciding the case against defendant Dale. Since the jury is presumed to follow the court's instructions, there is no error. *Harper*, 466 F.3d at 647.

---

[4] Paragraph number three of Instruction No. 24 reads: "Keep in mind that your must give separate consideration to the evidence about each individual defendant. Each defendant is entitled to be treated separately, and you must return a separate verdict for each defendant."

WHEREFORE, the United States respectfully requests this Court to enter an order denying defendant Dale's motion.

Respectfully submitted,

John F. Wood
United States Attorney

By      */s/ Kathleen D. Mahoney*
        Kathleen D. Mahoney
        Assistant United States Attorney

        */s/ Gregg R. Coonrod*
        Gregg R. Coonrod
        Assistant United States Attorney

        Charles Evans Whittaker Courthouse
        400 East 9th Street, Room 5510
        Kansas City, Missouri 64106
        Telephone: (816) 426-3122

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing was delivered on February 1, 2008, to the CM-ECF system of the United States District Court for the Western District of Missouri for electronic delivery to all counsel of record.

William Brian Gaddy
2345 Grand, Suite 675
Kansas City, MO 64108


*/s/ Kathleen D. Mahoney*
Kathleen D. Mahoney
Assistant United States Attorney

21